# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John A. Nordberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 7850 | **DATE** | 5/25/2001 |
| **CASE TITLE** | American Medical Assn vs. Tommy G. Thompson | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and order, for the reasons stated, the motion to dismiss is granted and this action is dismissed with prejudice. (13-1)

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | number of notices | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | | |
| | Notices mailed by judge's staff. | | | MAY 29 2001 | |
| | Notified counsel by telephone. | | | date docketed | 17 |
| ✓ | Docketing to mail notices. | | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | ED-7 FILED FOR DOCKETING 01 MAY 25 PM 5: 22 | | |
| | Copy to judge/magistrate judge. | | | date mailed notice | |
| TP | courtroom deputy's initials | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

AMERICAN MEDICAL ASSOCIATION, *et al.*, )
)
    Plaintiffs, )
)
)
v. ) No. 99 C 7850
)
)
TOMMY G. THOMPSON, Secretary of the ) Judge John A. Nordberg
United States Department of Health and )
Human Services,[1] )
)
    Defendant. )

DOCKETED

MAY 29 2001

MAY 29 2001

## MEMORANDUM OPINION AND ORDER

This case involves a challenge to one part of the overall statutory formula used by the Secretary of Health and Human Services to calculate the annual fee schedule used to pay Medicare physicians for their services. The plaintiffs, consisting of various physicians' associations including the American Medical Association, allege that the Secretary was obligated by statute to revise certain initial economic projections at a later point in time when the actual data underlying those projections became known. They claim that the Secretary's failure to account for these projection errors resulted in a loss of several hundred million dollars in fees to Medicare physicians for the fiscal years of 1998 and 1999. The Secretary has filed a motion to

---

[1] Tommy G. Thompson is substituted as defendant in place of the former Secretary Donna E. Shalala. *See* Fed. R. Civ. P. 25(d)(1).

dismiss, asserting that this issue is unreviewable by this court based on a "no review" provision in the Medicare statute. For the reasons set forth below, the motion is granted.

## BACKGROUND

In 1989, Congress introduced the concept of the fee schedule as a way of controlling payments to physicians providing Part B Medicare services.[2] This fee schedule specifies how much the government will pay physicians for each particular medical service. Each year, the Secretary publishes the schedule for the upcoming year.

The schedule is determined pursuant to a complex formula set forth in 42 U.S.C. § 1395w-4. The formula consists of three "core" components calculated together in a complex multi-step process. The Secretary first determines a "relative value" for each type of physician service. This process compares the value of one service to another. The calculation of the relative values is made pursuant to subsection (c) of the statute. The second core component is the "geographic adjustment factor." This factor takes into account the variance in costs for doctors working in different parts of the country. The calculation of the geographic adjustment factor is made pursuant to subsection (e).

The third core factor is the "conversion factor," which is used to convert the geographically adjusted relative values into specific dollar payments. This factor is calculated pursuant to subsection (d). Two components affect the calculation of the conversion factor: the Medicare Economic Index (not at issue here) and an update adjustment factor. The update adjustment factor, in turn, is revised to reflect the success or failure of meeting what is known as

---

[2]For a general overview of the Medicare program, *see Painter v. Shalala*, 97 F.3d 1351, 1353 (10th Cir. 1996).

the "sustainable growth rate" (or "SGR") target. The SGR is a target against which growth in expenditures for physicians' services is measured. The SGR is calculated pursuant to subsection (f). Plaintiffs are specifically challenging the way the Secretary calculated the SGR target.

Although it is not necessary to know all the details about how the SGR is calculated, two points should be noted. First, subsection (f) requires the Secretary to make an estimate, or projection, of four factors for the upcoming year. For example, the Secretary must make a guess as to the growth of the gross domestic product.[3] Second, as noted above, the calculation of the SGR helps determine the update adjustment factor which in turn helps determine the conversion factor in subsection (d).

The SGR concept was not added to the statute in 1989 when the concept of the physicians' fee schedule was first introduced. Instead, it was added in 1997 as part of the Balanced Budget Act of 1997. The impetus for using the SGR target, which replaced the older volume performance standard, came from a 1996 report by the Physician Payment Review Commission ("PPRC"), which is a congressionally created body designed to assist Congress on Medicare issues. In this 1996 report, the PPRC noted that the concept of the SGR target had a drawback in that it was based on projections that inevitably would be off by some amount. The PPRC therefore recommended in this report that any adoption of the SGR concept should include some annual method for correcting these projection errors. One method is to adjust the next

---

[3]Specifically, under subsection (f), the Secretary is required to make an annual "estimate" of: (i) the weighted average percentage increase in the fees for all physician services; (ii) the percentage change in the average number of individuals enrolled in Part B; (iii) the projected percentage growth in real gross domestic product per capita; and (iv) the percentage change in expenditures for all physicians' services which will result from changes in law and regulations. 42 U.S.C. § 1395w-4(f)(2).

year's SGR target to account for the actual data that came in regarding the previous year's SGR target.

On October 31, 1997, the Secretary published in the federal register the SGR target for fiscal year 1998. The Secretary indicated in this federal register notice that she would make a correction the next year for differences between "projected and actual" numbers underlying the SGR. However, one year later, in a November 2, 1998 federal register notice, the Secretary changed her mind and announced that there would be no subsequent correction for projection errors. The reason given was that she did not believe that she had the statutory authority to make such a revision. She noted that the statute specified that the SGR target should be based on the Secretary's "estimates."

The Secretary then requested comments on this issue. The American Medical Association submitted comments, arguing that Congressional intent should be authorized to allow for adjustments for projection errors. In the October 1, 1999 federal register notice, the Secretary responded to the AMA's comments:

> We do not believe that we have the authority to make adjustments based on Congressional intent because the statutory language clearly requires that estimated values be used for computing the SGR and there is no provision for revising estimates to reflect later data. Our actions are controlled by the clear statutory language. Thus, we will not be able to make adjustments to the SGR based on later data.

64 Fed. Reg. 53394, 53396 (1999). The Secretary indicated that HHS had submitted a proposal to Congress that would allow for an adjustment based on later-acquired data. *Id.*

In 1999, Congress did change the statute to explicitly authorize the Secretary to make adjustments for projection errors in the SGR target. *See* Medicare, Medicaid, and State

Childrens Health Insurance Program Balanced Budget Refinement Act of 1999 ("BBRA of 1999"). The statute now authorizes the Secretary to revise prior estimates of the SGR for up to two years thereafter. *See* BBRA of 1999, § 211(b)(5). However, in this Act, Congress also explicitly stated that this new procedure for revising earlier estimates did not apply to the 1998 and 1999 calculations. *Id.* ("[n]othing in [the new amendments] shall be construed as affecting the sustainable growth rates established for fiscal year 1998 or fiscal year 1999."). These are the two years that are at issue in this case.

Plaintiffs have filed a five-count complaint. As noted above, the central assertion of the complaint is that the Secretary was required by the statute -- specifically, subsection (f)(2) of § 1395w-4 -- to revise the 1998 and 1999 SGR targets and that her failure to do so resulted in a loss of several hundred million in fees to participating physicians. This allegation is set forth in Count II.

Counts I and III are based on the Administrative Procedure Act. Count I alleges that the 1997 federal register notice, in which the Secretary indicated that she would revise SGR target for projection errors, was a rule within the meaning of the APA and that the physicians were interested persons who should have been given prior notice and opportunity to comment on the Secretary's change of position that was announced in the 1998 federal register notice. Count III alleges that the Secretary's change of position from 1997 to 1998 was arbitrary, capricious, and an abuse of discretion. Count IV and V are constitutional claims based on the Secretary's failure to calculate the SGR target consistent with the statute and based on her change in positions from the 1997 to the 1998 federal register notice. Count IV is a claim for a regulatory taking under the Fifth Amendment, and Count V is a Fifth Amendment due process claim.

# DISCUSSION

The current motion concerns the preliminary question of whether this court is permitted to even review these claims. The Secretary seeks to dismiss this action based on the "no review" provision contained in subsection (i) of § 1395w-4. Subsection (i), which was added to the statute in 1989, provides in pertinent part as follows:

There shall be no administrative or judicial review . . . of –

* * *

> (B) the determination of relative values and relative value units under subsection (c) of this section . . .
>
> (C) the determination of conversion factors under subsection (d) of this section,
>
> (D) the establishment of geographic adjustment factors under subsection (e) of this section, . . .

42 U.S.C. § 1395w-4(i)(1). Subparts (B), (C), and (D) are linked to each of the three core factors in the statutory formula. Relevant to this motion, subpart (C) prohibits review of the "determination of conversion factors" in subsection (d).

The principle issue raised by the current motion is whether this prohibition on review of the determination of conversion factors in subsection (d) also means that there should be no review of the calculation of the SGR in subsection (f).

Plaintiffs argue that this "no review" provision does not encompass challenges to the SGR target. Relying on a technical and narrow reading of the statutory language, plaintiffs first state that this "no review" provision merely prohibits review of "the determination of conversion factors under subsection (d)" and then note that the SGR is neither a "conversion factor" nor is it

-6-

"under subsection (d)." They also place weight on the fact that the "no review" provision was adopted in 1989, which is eight years before the SGR concept was added to the statute. Plaintiffs thus suggest that, if Congress had intended for subsection (f) to be included under the "no review" provision, it would have amended subsection (i) to make this point clear. Finally, plaintiffs point to the general presumption that Congress intended for there to be judicial review of administrative action. *See generally Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670-73 (1986).

Notwithstanding plaintiffs' determined effort to avoid the application of this "no review" provision, we conclude that it applies to this case. The language and overall structure of the statutory scheme make clear that this provision was meant to cover disputes over the calculation of the SGR. *See American Society of Cataract and Refractive Surgery v. Shalala*, 94 F.Supp.2d 914, 919 n.1 (N.D. Ill. 2000) ("Congressional intent to preclude judicial review can also be fairly discerned from the legislative scheme and the overall structure of the Medicare Act Part B payment scheme.").

The mere fact that the SGR calculation is set forth in a separate subsection does not prove much. Although the details of the SGR calculation are not set out in subsection (d), the SGR calculation is incorporated into that subsection. Subsection (d) specifically refers to the "sustainable growth rate under subsection (f)." *See* 42 U.S.C. § 1395w-4(d)(3)(B)(ii); *see also* § 1395w-4(d)(3)(C)(ii). The SGR is thus a sub-component of the larger conversion factor. It has no other function beyond aiding in that calculation. Although the "no review" provision of subsection (i)(1)(C) refers to subsection (d), it also refers to the "determination of" the conversion factor. Simply stated, it would strain common sense to say that the SGR calculation

-7-

is not a part of the "determination of" the conversion factor. As the Secretary points out, if plaintiffs really are not challenging the conversion factor, then their lawsuit would have no real impact because it is only from the SGR's impact upon the conversion factor that the physician fee schedule is adjusted.

Moreover, plaintiffs have not suggested any reason why Congress would have wanted to exclude the SGR calculation from the "no review" provision of subsection (i). As a number of courts have commented, the "no review" provision in this statute is clear and comprehensive. *See, e.g., American Society of Cataract and Refractive Surgery*, 94 F.Supp.2d at 917 (this "statutory scheme expressly, clearly, and unambiguously precludes judicial review").[4] In particular, it directly targets all of the three core components of the overall formula. It would not make much sense for Congress to preclude review of the three main components of the statutory formula but then to allow review of challenges to the various sub-components of that formula.

This concern was at the heart of Judge Shadur's ruling in *American Society of Anesthesiologists v. Shalala*, 90 F.Supp.2d 973 (N.D. Ill. 2000), a case also involving a challenge to a subcomponent to the overall fee schedule formula. At issue was the relative value core

---

[4]The explicit nature of this "no review" provision has led a number of courts to conclude that the presumption against judicial review was not applicable. *See Painter*, 97 F.3d at 1356 ("We can think of little that Congress could have said to make the plain and unambiguous language of the statute, and its corresponding intent, more clear"); *American Society of Cataract and Refractive Surgery*, 94 F.Supp.2d at 917-18 (general presumption unwarranted); *American Society of Anesthesiologists v. Shalala*, 90 F.Supp.2d 973, 975 (N.D. Ill. 2000) ("there is no room for employing that presumptive approach where, as here, Congress has been *so explicit* in stating a prohibition against judicial review") (emphasis added). On a related point, plaintiffs state that this presumption in favor of judicial review is "particularly strong" in the situation where an agency has "disregarded a statutory mandate." (Pls. Resp. at 11.) However, as explained later in this opinion, plaintiffs' claim that the Secretary violated a statutory mandate is highly questionable.

component. The plaintiffs made a distinction between non-reviewable matters (the three core components) and reviewable matters (various subcomponents).[5] Judge Shadur concluded that this dichotomy was an "artificial construct" that would "impermissibly rewrite the statute." *Id.* at 976. He expressed concern that this type of argument would create, in effect, a gaping hole in the "no review" provision:

> Subsection (i)(1)(B) expressly states that the congressional prohibition against judicial review extends to the totality of "the determination of relative values and relative value units under subsection (c) of this section." And it simply will not do for Associations to say "Oh, we're only challenging Secretary's 'decisions that must be made before the relative value and relative value unit determinations'" [].
>
> * * *
>
> If Associations' position were accepted, the congressional mandate against court intervention would be totally frustrated, because the opportunity for parties such as Associations to launch in-court attacks on the individual strands – the specific items – that are both integral to and essential components of the congressionally-protected determinations that Secretary must make would defeat her ability to make the determinations themselves.

*Id.* Judge Shadur's reference to the "individual strands" of the formula is a perfect description of the SGR, which is simply a strand of the conversion factor, which in turn is indisputably covered by the "no review" provision.

In addition to Judge Shadur's ruling, two other courts have rejected arguments similar to the one made by plaintiffs here. In *Painter v. Shalala*, 97 F.3d 1351 (10th Cir. 1996), the Tenth Circuit considered a challenge to the "budget neutrality" provision, which was a part of the initial formula used to set the conversion factor under subsection (d). The Tenth Circuit concluded that

---

[5]Plaintiffs in this case make the same argument, stating that the "no review" provision of subsection (i) is "narrowly targeted" at the three core elements of the payment formula but that it does not encompass the "many nuances and refinements" of that formula. (Pls. Resp. at 12.)

-9-

the statutory language "clearly" indicated that Congress intended to preclude review of the "manner in which" the conversion factor is calculated by the Secretary. *Id.* at 1356. Likewise, in *American Society of Cataract and Refractive Surgery v. Shalala*, 94 F.Supp.2d 914 (N.D. Ill. 2000), Judge Williams concluded that the "no review" provision covered a challenge to one portion of the calculation of the relative value component. *Id.* at 918-19.[6]

The conclusion that Congress intended for the "no review" provision to apply to the type of challenge in this case makes sense from a broader perspective. As the Secretary points out, the general statutory scheme reflects the fact that the Congress intended for the Secretary to make a final determination of the fee schedule under a tight time deadline. Any concerns over the delegation of this task to the Secretary are tempered by the fact that this area is the subject of intense oversight and frequent review by Congress. Congress has been willing to make changes to the fee schedule formula when needed, as evidenced by the fact that Congress enacted the BBRA of 1999, which clarified the very issue that is the subject of this lawsuit.

In addition to their primary argument discussed above, plaintiffs raise a second argument. They claim that the "no review" provision should not be applied here because it will have the effect of foreclosing serious constitutional claims. *See Johnson v. Robison*, 415 U.S. 361, 366-67 (1974). The parties agree that the relevant standard, as summarized by the Seventh Circuit in

---

[6]In her analysis, Judge Williams found it significant that the subcomponent was determined before the calculation of the final relative value and therefore was "not something utilized afterwards." *Id.* at 919. Based on this fact, she distinguished *Furlong v. Shalala*, 1996 WL 393526 (S.D.N.Y. July 12, 1996), which is a case relied on by plaintiffs here. The plaintiffs in *Furlong* were challenging a policy that was utilized *after* the calculation of the relevant core component. Thus, it was more reasonable to argue that this policy was not a part of the "determination of" that factor.

-10-

*Czerkies v. U.S. Dept. of Labor*, 73 F.3d 1435 (7th Cir. 1996), is that a "door-closing statute" may not close the door to a constitutional claim "provided that the claim is colorable and the claimant is seeking only a new hearing or other process rather than a direct award of money by the district court." *Id.* at 1439. "One does not, of course, need a statute to close the doors of the court to claims that are insubstantial." *Id.* Stated differently, a party may not avoid a clear "no review" provision simply by making a challenge "cloaked in constitutional terms." *Id.* (quoting *Sugrue v. Derwinski*, 26 F.3d 8, 11 (2d Cir. 1994)).

In reviewing plaintiffs' constitutional claims, we are not persuaded that they are the type of serious and substantial claims that justify disregarding this clear "no review" provision. Plaintiffs describe their constitutional claims in their response brief at pp. 15-16. They allege that the Secretary's failure to calculate the SGR "consistent with the Medicare statute" violated the Fifth Amendment's due process clause and constitutes a regulatory taking. (*See* Cmplt. Counts IV and V.) As part of this argument, plaintiffs claim that physicians participating in Medicare have a property interest in having the SGR calculated in the particular manner set forth in the statute and that this interest entitled them to procedural due process. Specifically, they believe that they should have been allowed to comment on the Secretary's change in position before it was issued in the 1998 federal register notice. Plaintiffs also argue that the Secretary's failure to follow the statute violated the command of Article I, Section 1 that Congress, and not Article II agencies, shall make all laws. (*Id.* at 16.)

The underpinning of all these constitutional claims is the assertion that Secretary did not comply with the statute when she failed to revise the SGR targets for data subsequently received. However, this assertion is highly questionable. Plaintiffs give the impression in their brief that

-11-

the statute explicitly required the Secretary to revise the SGR for projection errors. For example, plaintiffs state that the Secretary "disregarded a statutory mandate" (Pls. Resp. at 11) and acted contrary to a "congressional directive" (*id.* at 16). Notwithstanding these broader descriptive phrases, plaintiffs nonetheless recognize that the statutory provision in question – subsection (f)(2) – clearly does not contain any such requirement. This point is underscored by the fact that, although plaintiffs allege that the Secretary should have followed the statute, they never once quote the statutory provision that she should have followed.

Instead, plaintiffs state that it was "contemplated" that the statute would contain such a requirement. This argument is based on one portion of the legislative history. Plaintiffs point to the fact that the 1996 PPRC report recommending that Congress adopt the SGR concept included a general statement to the effect that any adoption of the SGR concept also should include some mechanism to address the problem of projection errors. This evidence, in our opinion, is simply too attenuated to support plaintiffs' primary contention that the Secretary was obligated to revise for projection errors.

In contrast, in the 1999 BBRA, Congress made it clear that the Secretary was authorized to adjust the SGR targets at a later point in time. It is particularly noteworthy that, as part of this revision of the statute, Congress explicitly chose not to make this requirement applicable to the calculations for fiscal years 1998 and 1999 – the very years at issue in this lawsuit. *See* BBRA of 1999, § 211(b)(5) ("Nothing in [the new amendments] shall be construed as affecting the sustainable growth rates established for fiscal year 1998 or fiscal year 1999."). This point provides further support for the position that Congress did not earlier impose an explicit directive requiring the Secretary to revise the SGR targets at a later point in time.

In addition to the above problem, plaintiffs' constitutional claims suffer from other problems. In particular, plaintiffs must establish that the participating Medicare physicians had a constitutionally protected property interest. *See generally Board of Regents v. Roth*, 408 U.S. 564, 577 (1972) (a due process property interest is more than a "unilateral expectation;" it is a "legitimate claim of entitlement"). Plaintiffs are not simply claiming that these physicians had a general interest or expectation in being paid for their services. Nor are they saying that these physicians were not paid according to the rates set forth in the previously published fee schedule. *See, e.g., Furlong v. Shalala*, 156 F.3d 384, 393 (2d Cir. 1998) (fees were reduced below the fee schedule rate). Instead, they are claiming that these physicians had a legitimate right to expect that the payments would be calculated according to a particular methodology. We agree with the other courts that have rejected this type of argument. *See Painter*, 97 F.3d at 1356-67 (even assuming physicians have some general property interest in receiving payment for Part B medicare services, they do not have a property interest in having those payments "calculated in a particular manner"); *American Soc. of Cataract and Refractive Surgery*, 94 F.Supp.2d at 921.[7]

We also do not believe that plaintiffs have a viable takings claim. The Secretary has cited to a number of cases in which such claims have been rejected based on the fact that participation by physicians in the Medicare program is voluntary. *See Garelick v. Sullivan*, 987 F.2d 913, 917 (2d Cir. 1993) ("All court decisions of which we are aware that have considered takings

---

[7]Even if plaintiffs did establish a protectible property interest, they would have to show that they were denied procedural due process. Plaintiffs complain about the fact that they were not given the opportunity to comment before the 1998 federal register notice was issued. It should be noted, however, that the AMA (a plaintiff here) was given the opportunity to comment shortly after that notice was issued. The Secretary then considered the AMA's comments and rejected them based on an explanation given in the 1999 federal register notice.

challenges by physicians to Medicare price regulations have rejected them in the recognition that participation in Medicare is voluntary."); *Whitney v. Heckler*, 780 F.2d 963, 972 (11th Cir. 1986) (same); *Good Samaritan Med. Ctr. v. Heckler*, 605 F.Supp. 19, 26 (S.D. Ohio 1984) ("reduced compensation to providers under Medicare does not amount to a taking" under the Fifth Amendment).[8]

## CONCLUSION

For the reasons stated above, the motion to dismiss is granted and this action is dismissed with prejudice.

**ENTER:**

JOHN A. NORDBERG
Senior United States District Court Judge

**DATED:** May 25, 2001

---

[8] Plaintiffs also complain that, if the Secretary in 1997 had not led them to believe that she was going to revise the SGR targets, they would have sought "legislative clarification" to "confirm[] the Secretary's obligation" to do so. (¶ 53.) However, as noted above, in 1999 Congress made clear that the Secretary was not required to make changes to the SGR targets for fiscal years 1998 and 1999.